IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

|                          |   |                        |
|--------------------------|---|------------------------|
| DARRELL JOHN PENNER,     | ĭ |                        |
|                          | ĭ |                        |
|     Petitioner,          | ĭ |                        |
|                          | ĭ |                        |
| v.                       | ĭ | No. 11-1182-JDB-egb    |
|                          | ĭ |                        |
| JOE EASTERLING,          | ĭ |                        |
|                          | ĭ |                        |
|     Respondent.          | ĭ |                        |
|                          | ĭ |                        |

---

ORDER OF DISMISSAL
ORDER DENYING PETITIONER'S MOTION FOR AN EVIDENTIARY HEARING
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

---

On April 28, 2011, Petitioner, Darrell John Penner, Tennessee Department of Correction ("TDOC") prisoner number 370325, who was at the time an inmate at the Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee, filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Tennessee. (Docket Entry ("D.E.") 1.)[1] Penner paid the habeas filing fee on June 17, 2011. (D.E. 10.) On June 21, 2011, United States District Judge Todd J. Campbell transferred the case to this

---

[1] According to the TDOC website, Penner was released at the expiration of his sentence on June 12, 2012. He has not provided the Clerk with his new address.

district, where the convicting court is located. (D.E. 12.) The Court issued an order on July 8, 2011, directing the respondent, HCCF Warden Joe Easterling, to file the state-court record and a response to the petition. (D.E. 14.)

On August 31, 2011, Respondent filed his answer to petition and the state-court record. (D.E. 18 & 19.) On September 23, 2011, Petitioner filed his traverse in opposition to the Respondent's answer and request for an evidentiary hearing. (D.E. 20.)

## I.      STATE COURT PROCEDURAL HISTORY

On January 27, 2003, Penner was indicted in the Circuit Court for Perry County, Tennessee, on two counts of rape of a child. The victim was his four-year-old daughter. On December 12, 2003, Penner signed a petition for waiver of trial by jury and request for acceptance of plea of guilty and a negotiated plea agreement, which required him to plead guilty to a single count of aggravated sexual battery in exchange of a sentence of ten years, to be served as a violent offender at 100 percent. (Pet. for Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty, State v. Penner, Case No. 751 (Perry Cnty. Circuit Court), D.E. 19-3 at 8; Negotiated Plea Agreement, id., D.E. 19-3 at 9.) After a plea colloquy, the trial court accepted the guilty plea and imposed sentence. (Order Authorizing Waiver of Trial and Accepting Plea of Guilty, id., D.E. 19-3 at 10; Tr. of the Guilty Plea Hr'g, id.,

D.E. 19-3 at 13-25.)  Judgment was entered on December 12, 2003. (J., _id._, D.E. 19-3 at 11 & 12.)  Penner did not appeal.

On September 21, 2007, the Clerk of the Perry County Circuit Court docketed a _pro se_ petition for post-conviction relief submitted by the inmate. (Pet. for Post-Conviction Relief, <u>Penner v. State</u>, PCR No. 1009, D.E. 19-1 at 5-18.)[2]  Counsel was appointed to represent Penner (Order, _id._, D.E. 19-1 at 28-29), and an amended petition was filed on February 25, 2008 (Am. Pet. for Post-Conviction Relief, _id._, D.E. 19-1 at 31-32).  A post-conviction hearing was held on November 21, 2008 (Tr. of Post-Conviction Relief Hr'g, _id._, D.E. 19-2) and, on February 17, 2009, the post-conviction court denied the petition (Mem. of Law and Order, _id._, D.E. 19-1 at 56-62).  The Tennessee Court of Criminal Appeals affirmed.  <u>Penner v. State</u>, No. M2009-00670-CCA-R3-PC, 2010 WL 3516201 (Tenn. Crim. App. Sept. 9, 2010), _app. denied_ (Tenn. Jan. 18, 2011).

At the change of plea hearing, the State summarized the evidence it was prepared to offer had the case gone to trial:

---

[2]     The petition was signed on October 6, 2004 but was not docketed for almost three years.  The record contains no explanation for his discrepancy.  The State filed a motion to dismiss the post-conviction petition as untimely (Mot. to Dismiss, <u>Penner v. State</u>, PCR No. 1009 (Perry Cnty. Circuit Court), D.E. 19-1 at 44-45), but that motion was later withdrawn (Tr. of Post-Conviction Relief Hr'g at 5, _id._, D.E. 19-2.).  Under the Tennessee "mailbox rule," "[i]f papers required or permitted to be filed by these rules are prepared by or on behalf of a pro se petitioner incarcerated in a correctional facility and are not received by the clerk of the court until after the time fixed for filing, filing shall be timely if the papers were delivered to the appropriate individual at the correctional facility within the time fixed for filing."  Tenn. Sup. Ct. R. 28, § 2(G).  Respondent has conceded that Penner's instant § 2254 petition is timely. (D.E. 18 at 2.)

[I]n September 2002, Mr. Penner had unlawful sexual contact with one of his children, a child under the age of thirteen years old, who had a date of birth of May 12th of 1998.  During counseling for the treatment with the counselor, Mr. Penner informed that counselor, and then who was required by law to notify the authorities of the admission, the Department of Children Services, along with Investigator Barry Carroll with the district attorney's office, began an investigation of the matter. And after being advised of his Miranda warning, Mr. Penner gave a confession to both the DCS representative and Investigator Carroll admitting that he had had unlawful sexual contact with this child under thirteen years of age.

Also, had the case gone to trial, Mrs. Penner also would have been a witness that would have testified against Mr. Penner, also.

(Tr. of the Guilty Plea Hr'g at 10, <u>State v. Penner</u>, Case No. 751B (Perry Cnty. Circuit Ct. Dec. 12, 2003), D.E. 19-3.)  Penner admitted that those facts were correct.  (<u>Id.</u>)

## II.  PETITIONER'S FEDERAL HABEAS CLAIMS

The issues presented in this § 2254 petition are not clearly enumerated.[3]  Petitioner appears to complain that (1) his trial counsel allowed the State to violate his religious beliefs and practices; (2) counsel coerced him into a guilty plea that was not intelligent and voluntary; (3) trial counsel failed to conduct an

---

[3]    The form petition lists, as a first issue, that "[t]he state court's ruling was contrary to or an unreasonable application of the clearly established federal law as prescribed by the U.S. Supreme court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), <u>Boykin v. Alabama</u>, 89 S. Ct. 1709 (1969) and/or <u>Hill v. Lockhart</u>, 106 S. Ct. 366 (1970)" (D.E. 1 at 5 (emphasis omitted)), and, as the second issue, that "[t]he state-courts [sic] ruling that counsel was effective and that Petitioner did not prove by 'clear and convincing' evidence that he was entitled to relief is contrary to the U.S. Supreme Court's holding in <u>Strickland v. Washington</u>, 446 U.S. 668 (1984)" (D.E. 1 at 7).  These are legal arguments rather than issues.  For the sake of clarity, the Court has adopted the five issues that Petitioner contends he presented in his post-conviction petition. (<i>See id.</i> at 6; <i>see also</i> Pet. for Post-Conviction Relief, <u>Penner v. State</u>, PCR No. 1009 (Perry Cnty. Cir. Ct. Sept. 21, 2007), D.E. 19-1.)

4

adequate pretrial investigation and to interview potential defense witnesses; (4) counsel failed to have Penner's mental competence evaluated; and (5) trial counsel insisted that Penner enter into the plea agreement. (D.E. 1 at 6; *see also* <u>id.</u> at 5-6, 7-8.)

**III.      THE LEGAL STANDARD**

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

**A.   Waiver and Procedural Default**

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011), *reh'g denied*, ___ U.S. ___, 131 S. Ct. 2951, 180 L. Ed. 2d 239 (May 31, 2011). The petitioner must "fairly present"[4] each claim to all levels of state court review,

---

[4]     For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6,

(continued...)

up to and including the state's highest court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003) (emphasis omitted), *cert. denied*, 541 U.S. 956, 124 S. Ct. 1654, 158 L. Ed. 2d 392 (2004); *see* <u>Smith v. Morgan</u>, 371 F. App'x 575, 579 (6th Cir. 2010) (the <u>Adams</u> holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See* <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).

---

[4]     (...continued)
103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (per curiam) (internal citations omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996), *reh'g denied*, 518 U.S. 1047, 117 S. Ct. 22, 135 L. Ed. 2d 1116 (Aug. 27, 1996).

If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-07, 52 L. Ed. 2d 594 (1977), *reh'g denied*, 434 U.S. 880, 98 S. Ct. 241, 54 L. Ed. 2d 163 (Oct. 3, 1977); *see* Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553, 115 L. Ed. 2d 640 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"), *reh'g denied*, 501 U.S. 1277, 112 S. Ct. 27, 115 L. Ed. 2d 1109 (Sept. 13, 1991). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732, 111 S. Ct. at 2555; *see* Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), *cert. denied*, 544 U.S. 928, 125 S. Ct. 1653, 161 L. Ed. 2d 490 (2005).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a

fundamental miscarriage of justice.  <u>Schlup v. Delo</u>, 513 U.S. 298,

318-22, 115 S. Ct. 851, 862-64, 130 L. Ed. 2d 808 (1995); <u>Coleman</u>,

501 U.S. at 750, 111 S. Ct. at 2565.  The latter showing requires

a petitioner to establish that a constitutional error has probably

resulted in the conviction of a person who is actually innocent of

the crime.  <u>Schlup</u>, 513 U.S. at 321-22, 115 S. Ct. at 864; <i>see</i>

<u>House v. Bell</u>, 547 U.S. 518, 536-39, 126 S. Ct. 2064, 2076-78, 165

L. Ed. 2d 1 (2006) (restating the ways to overcome procedural

default and further explaining the actual innocence exception).

**B.  Merits Review**

Section 2254(d) establishes the standard for addressing claims

that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf
> of a person in custody pursuant to the judgment of a
> State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or
>      involved an unreasonable application of, clearly
>      established Federal law, as determined by the
>      Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an
>      unreasonable determination of the facts in light of
>      the evidence presented in the State court
>      proceeding.

28 U.S.C. § 2254(d).  The petitioner carries the burden of proof

for this "difficult to meet" and "highly deferential [AEDPA]

standard," which "demands that state-court decisions be given the

benefit of the doubt." <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398.[5]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Id.</u> at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 364-65, 120 S. Ct. 1495, 1498, 146 L. Ed. 2d 389 (2000).[6] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 365, 120 S. Ct. at 1498. The state court's application of clearly established federal law must be "objectively unreasonable." <u>Id.</u>, 120 S. Ct. at 1498. The writ may not issue merely because the habeas court, in its independent judgment, determines that the "state-court decision

---

[5] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007), *reh'g denied*, 551 U.S. 1177, 128 S. Ct. 7, 168 L. Ed. 2d 784 (July 30, 2007).

[6] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam), *reh'g denied*, 537 U.S. 1148, 123 S. Ct. 955, 154 L. Ed. 2d 854 (Jan. 13, 2003); *see* <u>Treesh v. Bagley</u>, 612 F.3d 424, 429 (6th Cir. 2010) (same), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (2011).

applied clearly established federal law erroneously or incorrectly." Renico v. Lett, ___ U.S. ___, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010); Williams, 529 U.S. at 411, 129 S. Ct. at 1522.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on an unreasonable determination of the facts. However, in Wood v. Allen, 558 U.S. 290, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010), *reh'g denied*, ___ U.S. ___, 130 S. Ct. 1942, 176 L. Ed. 2d 405 (Mar. 22, 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. Wood, 558 U.S. at ___, 130 S. Ct. at 849. In Rice v. Collins, 546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." Rice, 546 U.S. at 341-42, 126 S. Ct. at 976.

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir. 2008) (quoting Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)), *reh'g & reh'g en banc denied* (Aug. 14, 2008). "Even in the context of federal habeas, deference

does not imply abandonment or abdication of judicial review.'"
Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041,
154 L. Ed. 2d 931 (2003). A state court adjudication will not be
overturned on factual grounds unless objectively unreasonable in
light of the evidence presented in the state court proceeding.
Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010), *reh'g & reh'g en banc denied* (Dec. 28, 2010).

## IV.  ANALYSIS OF PETITIONER'S CLAIMS

Each of the issues presented in this petition was addressed at
the state post-conviction hearing. The Tennessee Court of Criminal
Appeals described the plea agreement and change of plea hearing:

> This case arises from allegations that the
> Petitioner had a sexual relationship with one of his
> children who was under the age of thirteen. . . .
>
> Pursuant to a plea agreement, the Petitioner pled
> guilty to one count of aggravated sexual battery, a Class
> B felony, and the trial court sentenced him to serve ten
> years in the Tennessee Department of Correction. During
> the plea hearing, the trial court listed the Petitioner's
> rights and asked the Petitioner whether he understood
> them, and the Petitioner responded in the affirmative.
> Further, the Petitioner testified that he understood he
> was waiving those rights by moving forward with the
> negotiated plea agreement. The Petitioner agreed that he
> understood the elements of the charge against him, the
> negotiated plea agreement, and the details of the
> sentence. He stated that he understood the consequences
> of his plea and the conviction. The Petitioner confirmed
> that his signature was on both the jury trial waiver and
> the negotiated plea agreement and that he reviewed both
> documents with his attorney. Finally, the Petitioner
> denied any use of alcohol or drugs that might impair his
> judgment and testified that he was voluntarily entering
> his guilty plea.

Penner v. State, 2010 WL 3516201, at *1.

The Tennessee Court of Criminal Appeals also summarized the evidence presented at the post-conviction hearing:

> The Petitioner's attorney ("Counsel") testified he represented the Petitioner and negotiated his plea agreement, although he was not present at the hearing where that guilty plea was entered. At the hearing, the Petitioner was represented by Counsel's co-counsel. Counsel recalled that, before the plea negotiations in this case, he received discovery from the State that included: (1) a police interview with the Petitioner that resulted in an admission against interest; (2) a police interview with the Petitioner's wife; and (3) information that the Petitioner "had, or was about to, attend a mental health facility." Counsel could not recall whether the Petitioner was seeking mental health treatment on his own volition or as a result of a third party request. Counsel learned through communication with the mental health facility that the Petitioner "had a sexual deviancy," and there was concern about his treatment "because he was basically defending himself for his actions." Counsel recalled that after psychological testing the Petitioner was diagnosed as a pedophile and an exhibitionist. The Petitioner was also diagnosed with a generalized anxiety disorder; however, Counsel said "there was nothing to indicate that [the Petitioner] couldn't appreciate right from wrong or he had any serious mental defect." Counsel also testified that he did not notice any mental issues in his interactions with the Petitioner. Based upon this, Counsel did not file a motion to determine the Petitioner's competency. Counsel explained this decision saying, "Based upon my interviews and consultations with [the Petitioner], he seemed very lucid, very -- he understood what he was facing, he was able to respond to me in an intelligent manner. And then after I read [the mental health facility] reports, I would not have any factual basis to question his competency."

> The Petitioner's post-conviction attorney then provided Counsel an assessment indicating the Petitioner was an individual with "severe and persistent mental illness." Counsel testified that he had never seen the document before and that the document would probably not have changed his case strategy because the Petitioner specifically requested a plea agreement, stating that he did not want to go to trial. Counsel acknowledged,

however, that he probably would have investigated further if he had seen this assessment.

Counsel recalled that the Petitioner was charged with two counts of rape of a child, and the Petitioner's wife was charged as a co-defendant. Counsel agreed that there was no physical evidence in this case and that the State's case rested on corroboration testimony. Counsel said that, although another attorney did the research on corroboration testimony, he provided the Petitioner with that research and, after the Petitioner read it, Counsel discussed with the Petitioner the law as it related to the Petitioner's case. Counsel said that he anticipated that the testimony necessary to corroborate the Petitioner's confession would have come from the Petitioner's children, the Petitioner's wife, and church members, to whom the Petitioner's [sic] had made incriminating statements. Counsel did not interview the children or the Petitioner's wife, but did review the interview of the Petitioner's wife that the police conducted. The interview revealed that the Petitioner's wife observed the Petitioner, unclothed, take their children into a bedroom and, on another occasion, take the victim outside in the dark without explanation. Counsel explained that he did not interview the Petitioner's family because the Petitioner was adamant he did not want his wife to face a trial or conviction and did not want his children involved in any way. "[The Petitioner] said they had suffered enough, he was trying to protect them."

Counsel testified that he was unaware of any threats made to the Petitioner regarding the loss of his children in the event he did not cooperate.

On cross-examination, Counsel testified that he had practiced law for thirty-three years. Counsel said that, during his entire representation of the Petitioner, the Petitioner was consistent in his request that Counsel negotiate a plea rather than take the case to trial.

Counsel's co-counsel, who was present at the guilty plea hearing and who conducted the research on corroboration testimony, testified that he worked in Counsel's office and researched accomplice testimony for the Petitioner's case. He also was with the Petitioner on the day he plead [sic] guilty:

[W]e were hoping to enter the plea and get 30 days to respond -- to report. I think [the Petitioner] said he had to wrap his business up. We got here that day, I spoke to the District Attorney about it, and we actually researched the law and found that since it was non-probatable offense, that he would not be able to enter the plea that day and then remain free on bond.

However, there was some concern[] that there would be a new judge in January, and the deal was so lenient, that if we went to a different judge, that judge would not accept the plea bargain and would reject that plea.

Co-counsel also remembered that the Petitioner was nervous when the hearing to accept his guilty plea was moved until after lunch. The Petitioner's reaction did not raise any questions in Co-counsel's mind as to the Petitioner's ability or willingness to plead guilty but, rather, indicated to Co-counsel that the Petitioner was nervous about whether the judge would accept the negotiated plea agreement. Co-counsel did not specifically recall going over the plea agreement with the Petitioner, but maintained that the Petitioner never indicated he did not understand the agreement. Co-counsel testified that had the Petitioner indicated any lack of understanding, Co-counsel would not have allowed the Petitioner to proceed with the guilty plea.

Bill Saul testified that he had known the Petitioner since 1999 and they were part of the same church community. Saul said that the church advocates that its members should submit to laws and the government unless "it would violate our conscience." Saul became aware of the Petitioner's conduct and said that the church community, out of concern for the Petitioner and his family, felt he needed to seek professional help. When asked if the church community had a position on the criminal matter, Saul responded:

You know, I have a little bit of difficulty in answering that. I don't recall that we sat down and said, "Now, this is the thing for you to do plead guilty," on the basis that he had confessed some sins. What I've heard here today is new to me; what I've already heard.

14

But on the basis of what he had confessed to me, well, if that was true, well, then the only thing to do would be to confess guilty.

Saul agreed that the church community would not necessarily want "its dirty laundry aired" but said that the church community would not take steps to prevent it either. Saul agreed that he was present for meetings between Counsel and the Petitioner and did not recall any discussion about whether or not the Petitioner should go to trial. Saul said that it was "advantageous" for the Petitioner to plead guilty rather than go to trial because the incidents would be less public. Saul speculated that the effect of the Petitioner's actions on his family and church community were a significant weight on the Petitioner. Saul recalled hearing that the Petitioner was having difficulty contacting Counsel but was never present for any of those phone calls.

On cross-examination, Saul testified that he never told the Petitioner he needed to plead guilty for the benefit of the community and that he never told him he needed to confess for the benefit of the community.

Susan E. Franks, an investigator with the Department of Children's Services ("DCS"), testified that she investigated allegations that the Petitioner engaged in oral sex with his four-year old daughter. Supporting the allegation were statements from the Petitioner and his wife, who witnessed the first incident when she saw the Petitioner with his penis in the victim's mouth when the victim was four months old.

Franks said that a formal forensic interview was never conducted with the victim, and, when she interviewed the victim at the home, the victim did not disclose anything. A physical examination of the victim was also conducted and the genital exam was normal.

On cross-examination, Franks testified that she had been a DCS investigator for almost thirteen years and, based upon that experience, she has found that, unless the sexual abuse is an acute rape, 95 to 98 percent of the time genital exams come back normal.

Barry Carroll, an investigator for the District Attorney's Office, testified that he interviewed both the Petitioner and his wife about these charges. Carroll

stated that he did not find any physical evidence of the charges during his investigation. Carroll denied ever telling the Petitioner that "it would go easier on him if he just accepted it and did what was asked of him" or that, if he did not cooperate, he would lose his children. Carroll said that the extent of his investigation was the interviews and that he was unaware of anyone, other than Franks, investigating the charges.

The Petitioner testified he hired Counsel based upon a recommendation from a deacon from the Petitioner's church. The Petitioner said that he met with Counsel three or four times in his office and twice in court. These discussions all focused on the guilty plea negotiation. The Petitioner stated that it was due to Counsel's "pressure and coercion" that he did not pursue a trial, explaining:

> Well, he was -- well, he would just -- for one thing, he would never speak of, he would never -- never wanted to speak of going to trial. I mean, he would speak about it, but he didn't want to go into it. Like, if I asked him -- I remember asking him about it, and he said, "Oh, you don't want to put your daughter on the stand, do you?"

> And I was like, No, I don't want to.

> And then I would try to ask more about it, and he wouldn't even answer my questions; he just -- he gave me the cold shoulder, and I couldn't go into it with him.

The Petitioner did not recall Counsel explaining what the State would have to prove in order for a jury to find him guilty of the charges. The Petitioner said that Counsel mentioned corroboration but he did not understand what Counsel was talking about. The Petitioner admitted that he did not ask Counsel to explain it to him but said this was because Counsel was "very controlling," and it was difficult to ask Counsel questions.

The Petitioner testified that he had been a member of the Mennonite community for his entire life and was taught to cooperate with the law and not to hinder it in any way. The Petitioner recalled meeting with Carroll and being advised he had the right to remain silent, but he said he did not understand that. He said he felt

"compelled to be there and to speak" based upon the way Carroll presented himself. The Petitioner recalled that Carroll showed him his badge and gun and said, "I'm authorized by the State of Tennessee to use this weapon if necessary. I want to make sure you understand who I am."

The Petitioner said that the investigation regarding these charges began because he was seeking mental health treatment for depression, anxiety, and panic attacks. The Petitioner said that, during the time of the investigation and plea, he was taking antidepressants but did not recall whether he told Counsel he was on medication. During this time, the Petitioner was also attending regular mental health appointments that he initiated with the support of his church. The Petitioner testified that he was diagnosed as manic-depressive with an anxiety disorder, but that, with continued treatment, he had a good prognosis for recovery. The Petitioner said he did not discuss his mental health treatment with Counsel because Counsel told him, "Your part is to make sure you go to all your appointments, and my part is to negotiate with the D.A."

The Petitioner testified that, from the beginning, Counsel advised that taking a plea agreement was his only option. He also said there was pressure placed on him regarding the charges against his wife:

> [From] my understanding, it came through DCS that I would need to take the guilty plea before they -- otherwise they would prosecute my wife and they would put up the children for adoption; you know, basically what I -- in my words, "on the open market." . . . And my wife conveyed this to me, and she was very, very concerned about it, because we were very scared about, you know, the children losing their mother as well.

The Petitioner testified that his church is a very "tight" organization where the church leaders have "authority over the congregation." Church members are obligated to follow the recommendations of the church community and a [sic] church member did not do as they instructed, they were subject to excommunication. The Petitioner said that excommunication of a family member would negatively impact the family, and it was not something he wanted for his wife and children.

17

The Petitioner did not recall any specific conversations with Counsel regarding evidence or discovery. The Petitioner denied ever telling Counsel he wanted to plea [sic] or that he was not interested in going to trial. The Petitioner testified that he could not reach Counsel by phone for almost three months. Once he finally reached Counsel, the Petitioner met him at his office and Counsel told him they had reached a plea agreement, and the Petitioner would be going to prison in two days. The Petitioner said:

> And that was the shock of my life right there, because I didn't know anything for several months, hadn't hardly talked to him . . . . he asked if I was ready to go, and I said, "No, I was not interested in taking a plea," and so then they put it off.

The Petitioner admitted that, even though he was on antidepressants at the time, he agreed at the plea hearing that he was not on medication that altered his ability to make a decision. He explained he only agreed because he did not know "the importance of the details." The Petitioner said he did not want to plead guilty but felt he had to in order to protect his wife and children. The Petitioner described his mental state at the guilty plea hearing:

> And one side of me screamed that this is ridiculous, I can't be doing this, this is not right, I can't believe that I'm being forced into this. And then the other side was screaming back and saying I don't know what else to do; there's not the slightest hope of anybody trying to help me, you know, and go in any other direction.

The Petitioner said that he did not discuss these thoughts with Counsel, explaining these ideas were simply what went through his mind during the hearing.

On cross-examination, the Petitioner agreed that there were four court appearances with Counsel rather than two as he had previously testified, which meant he met with Counsel at least seven or eight times during the course of the case. The Petitioner acknowledged that an employee of DCS never directly told him DCS was going to take his children, and that he was relying on his wife's statements in believing DCS would do so. The Petitioner

18

said he was not sure whether he specifically told Counsel he did not want a plea, but that was what was "in [his] mind." He said that he was intimidated by Counsel, who seemed "very cold and austere," and that he took the plea because he was trying to be "cooperative." The Petitioner agreed that he never requested a new attorney but emphasized that, because he had agreed for Counsel to represent him throughout the proceedings, he thought it was his "Christian duty" to honor that agreement.

The Petitioner agreed that the trial judge reviewed his rights and that the Petitioner, at the guilty plea hearing, testified that he understood the rights, but he explained that he only did so "to get the plea bargain." He felt the plea was his only option. The Petitioner agreed he answered in the affirmative to all of the trial judge's questions about whether he understood the plea, the conviction, and his rights because he felt "that's what was expected of [him]." "I can't say I didn't have any understanding, but it was my intention to take the plea bargain and that was, you know, because I didn't know what else to do."

Id. at *2-6 (alterations in original).

## A. Procedural Default

In his answer, Respondent first asserts that Penner has exhausted only the two issues presented in his brief to the Tennessee Court of Criminal Appeals, namely, that the guilty plea was not knowing and voluntary because trial counsel did not adequately explain the rule of corroboration, and that Petitioner was not mentally able to enter a guilty plea. (D.E. 18 at 10-11.) Respondent's argument is well taken. Although each of the issues presented in the instant petition was addressed at the post-conviction hearing, post-conviction counsel limited his brief to the Tennessee Court of Criminal Appeals to the issues previously mentioned. (See Appellant's Br. at 1, Penner v. State, Case No.

M2009-00670-CCA-R3-PC (Tenn. Crim. App. Sept. 8, 2009), D.E. 19-4.)
At a minimum, then, issues 1, 3, and 5 have not been exhausted in
state court and, because no avenue remains for presenting those
claims to the state courts, they are barred by procedural default.
Issues 2 and 4 are also unexhausted and barred by procedural
default except for claims that the guilty plea was not knowing and
voluntary because trial counsel did not adequately explain the rule
of corroboration and that Penner was not mentally able to enter a
guilty plea.

In his reply, Penner asserts that the fact that some of his
claims are unexhausted is "evidence of Tennessee's post-conviction
process being inadequate due to appointed counsel unilaterally
determining what issues to waive on appeal." (D.E. 20 at 1.) The
inmate contends that, due to his indigence, he was forced to rely
on appointed counsel and, therefore, the State is responsible for
any failure to exhaust. (Id. at 2.)

"There is no constitutional right to an attorney in state
post-conviction proceedings. Consequently, a petitioner cannot
claim constitutionally ineffective assistance of counsel in such
proceedings." Coleman, 501 U.S. at 752, 111 S. Ct. at 2566
(internal citations omitted). Attorney error cannot constitute
"cause" for a procedural default "because the attorney is the
petitioner's agent when acting, or failing to act, in furtherance
of the litigation, and the petitioner must bear the risk of

attorney error." <u>Id.</u> at 753, 111 S. Ct. at 2566-67 (internal quotation marks omitted). Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. <u>Id.</u> at 754, 111 S. Ct. at 2567.[7]

This conclusion is not altered by the Supreme Court's recent decision in <u>Martinez v. Ryan</u>, ___ U.S. ___, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), which recognized a narrow exception to the rule stated in <u>Coleman</u> "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." <u>Martinez</u>, ___ U.S. at ___, 132 S. Ct. at 1320. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." <u>Id.</u>, 132 S. Ct. at 1320.

<u>Martinez</u> arose under an Arizona law that does not permit ineffective assistance claims to be raised on direct appeal. <u>Id.</u> at ___, 132 S. Ct. at 1313. "[I]n Tennessee, there is no prohibition against litigation of ineffective counsel claims on direct appeal, as opposed to collateral proceedings." <u>Leberry v. Howerton</u>, No. 3:10-00624, 2012 WL 2999775, at *1 (M.D. Tenn. July

---

[7]    *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

23, 2012) (internal quotation marks omitted). Although ineffective assistance claims are usually raised in post-conviction proceedings in Tennessee, the decision in <u>Leberry</u> declined to extend the reasoning of <u>Martinez</u>, explaining that "the equities of concern in <u>Martinez</u> do not extend to situations where, as here, a petitioner is represented in his post conviction proceeding by yet another attorney who is free to make the ineffectiveness of trial counsel claim." <u>Id.</u> at *2.

The instant case is distinguishable from <u>Leberry</u> because Penner entered into a plea agreement with a negotiated sentence and, therefore, he had no right to a direct appeal. In this case, then, the post-conviction proceeding was the first opportunity for Petitioner to raise his claims that trial counsel were ineffective. However, he cannot rely on the alleged ineffectiveness of post-conviction counsel to excuse the procedural default of issues 1, 3, and 5 and portions of issues 2 and 4 because those issues were not overlooked by post-conviction counsel. Each issue was presented in the *pro se* post-conviction petition filed by Penner, and testimony was taken on each issue at the post-conviction hearing. The procedural default occurred when post-conviction counsel exercised his discretion to limit the brief to the Tennessee Court of Criminal Appeals to the strongest arguments.[8] The instant case is

---

[8]    *See* <u>Smith v. Murray</u>, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434 (1986) (the failure to raise a non-frivolous issue on appeal does not constitute *per se* ineffective assistance of counsel, as "[t]his process of
(continued...)

procedurally similar to <u>Coleman</u>, as "[t]he alleged failure of counsel in <u>Coleman</u> was on appeal from an initial-review collateral proceeding, and in that proceeding the prisoner's claims had been addressed by the state habeas trial court." <u>Martinez</u>, ___ U.S. at ___, 132 S. Ct. at 1316. Thus, as in <u>Coleman</u>, each of Penner's claims were reviewed by one court, and <u>Martinez</u> is, therefore, inapplicable. *See* <u>id.</u> at ___, 132 U.S. at 1316.

The Court DISMISSES issues 1, 3, and 5 because they have not been exhausted in state court and are barred by procedural default. The Court also DISMISSES issues 2 and 4 as unexhausted and barred by procedural default except for claims that the guilty plea was not knowing and voluntary because trial counsel did not adequately explain the rule of corroboration and Penner was not mentally able to enter a guilty plea.

## B. Ineffective Assistance of Counsel

The prisoner's ineffective assistance claim, as presented to the Tennessee Court of Criminal Appeals, was limited to a claim that counsel did not adequately explain the rule of corroboration. Although the allegation is not clearly stated, it appears that Penner is asserting both that counsel was ineffective for allowing him to plead guilty even though he could not be convicted of aggravated sexual abuse under Tennessee law because of the absence

---

[8]      (...continued)
winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy").

of corroborating evidence and that, as counsel failed to explain the rule of corroboration, his guilty plea was not intelligent and voluntary. (*See* D.E. 1 at 6-7; *see also* Appellant's Br. at 1, 4-5, <u>Penner v. State</u>, Case No. M2009-00670-CCA-R3-PC (Tenn. Crim. App. Sept. 8, 2009), D.E. 19-4.)

A claim that ineffective assistance of counsel has deprived a petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (June 25, 1984). In order to be entitled to relief under <u>Strickland</u>, a petitioner must demonstrate "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's performance was prejudicial to the defense[.]" <u>United States v. Munoz</u>, 605 F.3d 359, 376 (6th Cir. 2010) (internal quotation marks omitted), *cert. denied,* ___ U.S. ___, 131 S. Ct. 1813, 179 L. Ed. 2d 794 (2011).

With respect to the first element,

> [a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.

<u>Harrington v. Richter</u>, ___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011) (internal citations & quotation marks omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Richter, ___ U.S. at ___, 131 S. Ct. at 787-88 (internal citations & quotation marks omitted); see also id. at ___, 131 S. Ct. at 791-92 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable."); Wong v. Belmontes, 558 U.S. 15, __, 130 S. Ct. 383, 390-91, 175 L. Ed. 2d 328 (2009) (per curiam) ("But Strickland does not require the State to rule out [a more favorable outcome] to prevail. Rather, Strickland places the burden on the defendant,

---

[9] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id., 104 S. Ct. at 2069.

not the State, to show a reasonable probability that the result would have been different.").

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Ky.</u>, ___ U.S. ___, ___, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

<u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 788 (internal citations & quotation marks omitted).

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009), *reh'g denied by* <u>In re Word</u>, ___ U.S. ___, 129 S. Ct. 2422, 173 L. Ed. 2d 1327 (May 18, 2009).

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable

applications is substantial.  Federal habeas courts must
guard against the danger of equating unreasonableness
under Strickland with unreasonableness under § 2254(d).
When § 2254(d) applies, the question is not whether
counsel's actions were reasonable.  The question is
whether there is any reasonable argument that counsel
satisfied Strickland's deferential standard.

Richter, ___ U.S. at ___, 131 S. Ct. at 788 (internal citations &

quotation marks omitted).

The two-part test stated in Strickland applies to challenges

to guilty pleas based on the ineffective assistance of counsel.

Hill v. Lockhart, 474 U.S. 52, 57, 106 S. Ct. 366, 369-70, 88 L.

Ed. 2d 203 (1985); see also Premo v. Moore, ___ U.S. ___, ___, 131

S. Ct. 733, 740-43, 178 L. Ed. 2d 649 (2011) (discussing

application of Strickland to guilty pleas under § 2254(d)).

"Where, as here, a defendant is represented by counsel during the

plea process and enters his plea upon the advice of counsel, the

voluntariness of the plea depends on whether counsel's advice was

within the range of competence demanded of attorneys in criminal

cases."  Hill, 474 U.S. at 56, 106 S. Ct. at 369  (internal

quotation marks omitted).  "[T]o satisfy the prejudice requirement,

the defendant must show that there is a reasonable probability

that, but for counsel's errors, he would not have pleaded guilty

and would have insisted on going to trial."  Id. at 59, 106 S. Ct.

at 370 (internal quotation marks omitted); see also Padilla, 559

U.S. at ___, 130 S. Ct. at 1485 ("[T]o obtain relief on this type

of claim, a [prisoner] must convince the court that a decision to

reject the plea bargain would have been rational under the circumstances.").[10]

The Supreme Court has emphasized the importance of strict adherence to <u>Strickland</u> in reviewing challenges to guilty pleas, noting in <u>Premo</u> that

> [a]n attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.

<u>Premo</u>, ___ U.S. at ___, 131 S. Ct. at 741.

The Tennessee Court of Criminal Appeals rejected Penner's ineffective assistance claim on the merits, stating as follows:

> The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. <u>State v. White</u>, 114 S.W.3d 469, 475 (Tenn. 2003); <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn. 1999); <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn.

---

[10]    The Supreme Court emphasized that,

[i]n many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

<u>Hill</u>, 474 U.S. at 59, 106 S. Ct. at 370-71.

1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only

constitutionally adequate representation. <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 665 n.38, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. <u>Williams v. State</u>, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. <u>House</u>, 44 S.W.3d at 515 (citing <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. <u>House</u>, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the <u>Strickland</u> test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694; <u>Nichols v. State</u>, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>Harris v. State</u>, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner argues that Counsel did not completely explain the corroboration requirements for accomplice testimony or protect the Petitioner's due process rights by making sure the State could establish corroborating evidence to support the Petitioner's confession. In regard to this issue, the post-conviction court found:

> The proof at the evidentiary hearing establishes that the State had sufficient evidence to independently corroborate the Petitioner's confessions. According to the DCS investigator, the Petitioner's wife had observed him having oral sex with the victim. Smith and Wood were aware of this eye witness testimony as well as the

information that the Petitioner had confessed to
other members of his community. This Court is
satisfied that had this matter proceeded to trial
the State would very likely have been able to
succeed in getting this independent evidence before
the fact finder which would have resulted in a
conviction of Child Rape.

On all disputed issues between [Counsel], Wood and
the Petitioner on this issue, the Court finds
[Counsel's] and Wood's testimony more credible.
They did what they were asked to do -- get the
Petitioner the best plea agreement they could and
avoid a trial.

Our review of the record supports the conclusions of
the post conviction court. The Petitioner admitted to
his church community, family, and investigators that he
had engaged in sexual conduct with his daughter, the
victim. The Petitioner's wife also gave statements
consistent with the Petitioner's confession. She said
that she had seen the Petitioner engage in oral sex with
the victim when she was an infant. Further, she
witnessed the Petitioner take her daughters into a
bedroom unclothed. On another occasion, she witnessed
the Petitioner take the victim outside in the dark
without explanation. The Petitioner was also diagnosed,
based on mental health testing and assessment, as a
pedophile and an exhibitionist, which is consistent with
his admissions and the charges against him. While a
conviction cannot be supported solely on uncorroborated
admissions to a crime, it requires only "slight evidence"
which may be either direct or circumstantial, to
corroborate a confession and sustain a conviction. State
v. Alec Joseph Mesot, No. M2006-02599-CCA-R3-CD, 2008 WL
732151, at *3 (Tenn. Crim. App. March 14, 2008) *no perm.
app. filed*; State v. Ellis, 89 S.W.3d 584, 600 (Tenn.
Crim. App. 2000).

As to Petitioner's claim that Counsel did not
explain corroboration testimony to him, the Petitioner
testified that Counsel spoke with him about corroborative
evidence, but he did not understand it and did not seek
further clarification of the information or tell Counsel
he did not understand. The post-conviction court found
Counsel's testimony was credible and found that the
Petitioner had not demonstrated by clear and convincing
evidence that Counsel's representation rose to the level

> of ineffective assistance or that it prejudiced the
> Petitioner. We conclude the evidence does not
> preponderate against the post-conviction court's
> findings. The Petitioner is not entitled to relief on to
> this issue.

Penner v. State, 2010 WL 3516201, at *7-9.

Penner contends that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, the Supreme Court's decisions in Strickland and Hill. (D.E. 1 at 5, 7-8.) He also argues that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. (Id. at 6.)

Penner has not established that the decision of the Tennessee Court of Criminal Appeals was contrary to Strickland and Hill. This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland and Hill] to the facts of a prisoner's case" and, therefore, it does "not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406, 120 S. Ct. at 1520.[11]

Penner also has not satisfied his burden of demonstrating that the conclusion of the Tennessee Court of Criminal Appeals was an objectively unreasonable application of Strickland and Hill. In

---

[11]    The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

this case, he chose to plead guilty at a relatively early stage of the case.

> In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.

Premo, ___ U.S. at ___, 131 S. Ct. at 742.

In this case, Penner was charged with two counts of rape of a child. Under Tennessee law at the time, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is . . . less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Rape of a child is a Class A felony. Tenn. Code Ann. § 39-13-522(b). Under Tennessee law at the time, the sentencing range for a Class A felony was between fifteen and sixty years. Tenn. Code Ann. § 40-35-111(b)(1). Penner pled guilty to aggravated sexual battery,[12] a Class B felony, *see* Tenn. Code Ann. § 39-13-504(b), which carried a sentencing range from eight to thirty years, Tenn. Code Ann. § 40-35-111(b)(2). Counsel recommended that Penner accept a guilty

---

[12] "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (4) [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4).

plea to a single count of a lesser offense with a negotiated sentence of ten years, thereby avoiding the substantially higher minimum sentence for a child rape conviction and the possibility of consecutive sentencing.

It is also important to recall that there was some urgency to the plea agreement. Trial counsel testified that "there was some concern that there would be a new judge in January, and the deal was so lenient, that if we went to a different judge, that that judge would not accept the plea bargain and would reject that plea." (Tr. of Post-Conviction Relief Hr'g at 37, Penner v. State, PCR No. 1009 (Perry Cnty. Cir. Ct.), D.E. 19-2.) The Supreme Court has emphasized that, in evaluating an attorney's recommendation that his client plead guilty, special deference should be accorded to counsel's "insights borne of past dealings with the same . . . court." Premo, ___ U.S. at ___, 131 S. Ct. at 741.

The Tennessee Court of Criminal Appeals emphasized -- and Penner does not deny -- that he

> admitted to his church community, family, and investigators that he had engaged in sexual conduct with his daughter, the victim. The Petitioner's wife also gave statements consistent with the Petitioner's confession. She said that she had seen the Petitioner engage in oral sex with the victim when she was an infant. Further, she witnessed the Petitioner take her daughters into a bedroom unclothed. On another occasion, she witnessed the Petitioner take the victim outside in the dark without explanation. The Petitioner was also diagnosed, based on mental health testing and assessment, as a pedophile and an exhibitionist, which is consistent with his admissions and the charges against him.

34

Penner v. State, 2010 WL 3516201, at *9; see also id. at *4
(Penner's wife told the DCS investigator that she "witnessed the
first incident when she saw the Petitioner with his penis in the
victim's mouth when the victim was four months old"). The Court of
Criminal Appeals concluded that there was sufficient corroboration
to sustain the inmate's conviction. Id. at *9. Under those
circumstances, counsel's advice to his client that he plead guilty
to a lesser offense with an agreed sentence of ten years was not
objectively unreasonable.

The Tennessee Court of Criminal Appeals also credited
counsel's testimony at the post-conviction hearing that he
explained the corroboration rule to Penner before he decided to
accept the plea deal. Id.; see also id. at *2 (summarizing the
testimony of trial counsel). The Tennessee Court of Criminal
Appeals noted that, under Penner's version of events, he "did not
seek further clarification of the information or tell Counsel he
did not understand." Id. at *9; see also id. at *5 (Petitioner's
testimony). This conclusion is not objectively unreasonable. The
prisoner testified at the change of plea hearing that his attorneys
explained the elements of aggravated sexual battery. (Tr. of
Guilty Plea Hr'g at 6-7, State v. Penner, Case No. 751B (Perry
Cnty. Cir. Ct.), D.E. 19-3.)

Finally, Penner argues that the decision of the Tennessee
Court of Criminal Appeals that there was sufficient evidence to

convict him of aggravated sexual battery was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. (D.E. 1 at 6.) His argument is, in essence, a dispute with the interpretation of Tennessee law by the Tennessee Court of Criminal Appeals. This Court is authorized to issue a writ of habeas corpus with respect to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.).[13]

---

[13] Penner also contends that his wife's eyewitness testimony would not be admissible because she was an "indicted co-defendant." (D.E. 1 at 6.) In holding that there was sufficient evidence to convict Penner, the state court likely rejected that argument. At the post-conviction hearing, co-counsel testified that Amy Penner had been indicted for child neglect because she did not take action when she witnessed the first act of abuse. (Tr. of Post-Conviction Relief Hr'g at 40, Penner v. State, PCR No. 1009 (Perry Cnty. Cir. Ct.), D.E. 19-2.) Trial counsel testified that he discussed with Penner whether his wife's testimony could be used as corroboration. (Id. at 19-21.) According to counsel, "the State had indicated to me they would probably nolle her where she would no longer be a co-defendant." (Id. at 19; see also id. at 20-21 (counsel's opinion that Mrs. Penner could corroborate the abuse), 24 (Mrs. Penner had observed the abuse), 29-30 (Mrs. Penner could partially corroborate the second charged act).)

Penner also argues, in passing, that the decision of the Tennessee Court of Criminal Appeals that there was sufficient corroboration is contrary to or an unreasonable application of Opper v. United States, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 2d 101 (1954), and Smith v. United States, 348 U.S. 147, 75 S. Ct.

(continued...)

36

For all the foregoing reasons, Penner's ineffective assistance claim is without merit and is DISMISSED.

## C. Involuntary Guilty Plea

As previously noted, Penner also exhausted a claim that his plea was involuntary because he was not mentally able to enter a guilty plea.  The standard for evaluating the voluntariness of a guilty plea is as follows:

> A defendant who pleads guilty waives a number of federal constitutional rights, including the right to a jury trial and the right to confront his accusers. Because of the importance of these rights, reviewing courts must ensure that the defendant's waiver was knowing and voluntary.  We therefore insist that the defendant appreciated the consequences of the waiver, did so without coercion, and understood the rights surrendered. Specifically, guilty pleas not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.  The Supreme Court defines a voluntary plea as one entered by one fully aware of the direct consequences.

> While a defendant need not know all the possible consequences of his plea, like the loss of his right to vote or own a gun, or the effect on future sentence [sic], he must be aware of the maximum sentence to which he is exposed.  And, at a minimum, the defendant must understand the 'critical' or 'essential' elements of the offense to which he or she pleads guilty.  The satisfaction of these requirements cannot be inferred from the bare fact that the defendant pleaded guilty,

[13] (...continued)
194, 99 L. Ed. 2d 192 (1954).  (D.E. 1 at 7.)  Opper and Smith, which involved convictions under federal criminal laws, stand for the general proposition that an accused may not be convicted solely on the basis of his own uncorroborated confession.  Opper, 348 U.S. at 93, 75 S. Ct. at 164; Smith, 348 U.S. at 152-53, 75 S. Ct. at 197.  The Supreme Court has cautioned against incorporating its decisions in cases that did not involve ineffective assistance into a Strickland analysis.  See Premo, ___ U.S. at ___, 131 S. Ct. at 743.  In this case, the state court accepted counsel's view that there was sufficient corroboration of Penner's confessions under Tennessee law.

because he still might not have known what he was giving
up when he did so.

Ruelas v. Wolfenbarger, 580 F.3d 403, 408-09 (6th Cir. 2009)

(internal citations & quotation marks omitted), *cert. denied*, ___

U.S. ___, 130 S. Ct. 3322, 176 L. Ed. 2d 1220 (2010).

The Tennessee Court of Criminal Appeals affirmed the post-
conviction court's conclusion that Penner's guilty plea was
intelligent and voluntary, stating as follows:

> The Petitioner next contends his guilty plea was not
> knowingly and voluntarily entered due to his mental
> illness and pressure placed upon him to protect his
> family.
>
> When evaluating the knowing and voluntary nature of
> a guilty plea, the United States Supreme Court has held
> that "[t]he standard was and remains whether the plea
> represents a voluntary and intelligent choice among the
> alternative courses of action open to the defendant."
> North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160,
> 27 L. Ed. 2d 162 (1970). The court reviewing the
> voluntariness of a guilty plea must look to the totality
> of the circumstances. *See* State v. Turner, 919 S.W.2d
> 346, 353 (Tenn. Crim. App. 1995); *see also* Chamberlain v.
> State, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The
> circumstances include:
>
>> [T]he relative intelligence of the defendant; the
>> degree of his familiarity with criminal
>> proceedings; whether he was represented by
>> competent counsel and had the opportunity to confer
>> with counsel about the options available to him;
>> the extent of advice from counsel and the court
>> concerning the charges against him; and the reasons
>> for his decision to plead guilty, including a
>> desire to avoid a greater penalty that might result
>> from a jury trial.
>
> Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993)
> (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir.
> 1984)). A plea resulting from ignorance,

misunderstanding, coercion, inducement, or threats is not "voluntary." Id.

In the case under submission, the post-conviction court found:

> After a close review of the transcript of the plea hearing, it appears the Trial Court was very thorough in his explanations of the various rights of the Petitioner and the rights that the Petitioner would be giving up by pleading guilty. The transcript does not reveal that the Petitioner did not understand these rights.
>
> The record establishes that trial counsel explained the plea agreement and the resulting consequences to the Petitioner before the Petitioner entered his plea.
>
> Additionally, it does not appear from the record that the Petitioner's plea was the result of pressure or force to accept the plea agreement. The Petitioner's current position on this point is inconsistent with the credible testimony of the Petitioner's trial counsel as well as the Petitioner's admissions to the trial judge at the time he entered his plea that his actions were knowingly and voluntarily made. The Petitioner's remarks made at the plea hearing indicate that he was fully aware of the nature and the consequences of the plea and that he made a knowing, intelligent, and voluntary decision to accept the agreement.

At the Petitioner's guilty plea hearing, the Petitioner testified that his plea was voluntarily made. Counsel testified that he reviewed the Petitioner's mental health records and there was nothing to indicate incompetency and, furthermore, based on his own interaction with the Petitioner he found no basis to question th [sic] Petitionre's [sic] competency. Counsel described the Petitioner as lucid and recalled that the Petitioner's responses to Counsel were intelligent, which is consistent with the Petitioner's responses to the trial court during his guilty plea hearing. The post-conviction court found the Petitioner's responses to the trial court at his plea hearing reflected his understanding of his rights. The Petitioner acknowledged

that he testified at the guilty plea hearing that he understood the plea, sentence, and conviction. He explained to the post-conviction court that he pled guilty not because he "didn't have any understanding," he intended to take the plea because he did not know what else to do.

The Petitioner relies specifically on an unsigned document stating that the Petitioner was "a person with severe and persistent mental illness" to support his claim that his plea was involuntary due to mental incompetency. This document was introduced at the post-conviction hearing through Counsel who testified that he had never seen it. There was no testimony, expert or otherwise, explaining the document, where it came from, who administered the test it documented, or how its contents would relate to the Petitioner's competency to enter a guilty plea. Thus, the evidence of record does not preponderate against the post-conviction court's findings, but supports the findings of fact and conclusions of law reached by the post-conviction court.

Finally, the Petitioner claims that his plea was not voluntary because "he was under great strain from those whom he wanted to protect." The post-conviction court specifically accredited Counsel's testimony that he was unaware of any threats made to the Petitioner in regard to the loss of his children. Further, the post-conviction court found the Petitioner's testimony at the guilty plea hearing credible when he testified that his plea was voluntary. It is not the province of this court to re-weigh a trial court's credibility determination, as that decision is best made by the trial court. <u>State v. Holder</u>, 15 S.W.3d 905, 912 (Tenn. 1999). Moreover, there was no evidence introduced at the post-conviction hearing, other than the Petitioner's statements, supporting coercion from DCS or the District Attorney's investigator. Co-counsel testified that he reviewed the plea agreement with the Petitioner prior to the plea, and the Petitioner did not indicate he did not understand. The Petitioner also testified that he did not tell Co-counsel or Counsel that he did not want to plead guilty or did not understand the plea, the conviction, or his rights. Finally, we note that at the guilty plea hearing the trial court was very thorough in its explanation of the Petitioner's rights. The Petitioner testified that he understood and stated that he was entering the plea voluntarily.

Following our review of the record, we conclude that the Petitioner has failed to establish that the proof preponderates against the findings made by the post-conviction court that his plea was entered knowingly and voluntarily.

Penner v. State, 2010 WL 3516201, at *10-11.

Penner asserts that the decision of the Tennessee Court of Criminal Appeals was contrary to or involved an unreasonable application of Boykin. (D.E. 1 at 5.) In that case, the prisoner entered a guilty plea to five indictments charging him with common law robbery, an offense which, at the time, carried a death sentence. Boykin, 395 U.S. at 239, 89 S. Ct. at 1710. "So far as the record shows, the judge asked no questions of petitioner concerning his plea, and petitioner did not address the court." Id., 89 S. Ct. at 1710. The Supreme Court held that "[i]t was error, plain on the face of the record, for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." Id. at 242, 89 S. Ct. at 1711. "Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." Id. at 242-43, 89 S. Ct. at 1712. The Supreme Court held:

Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. Second, is the right to trial by jury. Third, is the right to confront one's

accusers. We cannot presume a waiver of these three important federal rights from a silent record.

Id. at 243, 89 S. Ct. at 1712 (internal citations omitted).

Penner has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary to Boykin. The instant case was a run-of-the-mill decision applying the rule of Boykin to the facts of a prisoner's case and, therefore, the "contrary to" clause of 28 U.S.C. § 2254(d)(1) is not implicated.

Petitioner also has not shown that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Boykin. He was represented at the change of plea hearing by his co-counsel, Chad Wood. (Tr. of Guilty Plea Hr'g at 1, State v. Penner, Case No. 751B (Perry Cnty. Circ. Ct.), D.E. 19-3.) The transcript reflects that Penner was advised of the rights he was giving up by pleading guilty. (Id. at 2-5.) He was also advised that his conviction could be used in subsequent cases to enhance his sentence. (Id. at 4.) The inmate testified that he understood his rights and that a guilty plea waived those rights. (Id. at 5-6; see also id. at 8-9.) He acknowledged the terms of the plea agreement and stated that his attorneys discussed with him the elements of aggravated sexual battery. (Id. at 6-7.) The trial judge advised Penner that, "[u]nder that particular statute, aggravated sexual battery is unlawful sexual contact with a victim by the defendant, or the defendant by a victim, accompanied by any

42

of the following circumstances: force or coercion, bodily injury, or if the victim is less than thirteen years of age." (<u>Id.</u> at 7.) The judge also stated that "[a]ggravated sexual battery is a Class B felony." (<u>Id.</u>) Penner acknowledged that his attorney had discussed the range of punishment for a violent offender convicted of a Class B felony (<u>id.</u>), and the Court told him that he would have to serve 100 percent of his sentence, less sentencing credits, "which I think nets out to eight-five percent" (<u>id.</u>). He admitted that his attorney had told him about his range of punishment and the percentage he would have to serve. (<u>Id.</u> at 8.) The prisoner also acknowledged that he had had sexual contact with a child under the age of thirteen, that he informed a counselor who was required to report the abuse, and that he had given a confession to both the DCS and an investigator with the District Attorney's office. (<u>Id.</u> at 10.)

The trial court questioned Penner to ensure that his plea was intelligent and voluntary:

> THE COURT: . . . Now, I do have your petition for waiving your jury trial and your negotiated plea agreement. I need to ask you, is this your signature, Mr. Penner, on these documents?
>
> THE DEFENDANT: Yes, it is.
>
> THE COURT: Did you go over these documents with Mr. Wood before you --
>
> THE DEFENDANT: Yes, I read over it with him.
>
> THE COURT: You read over it, went over it, and then you signed it; is that right?

THE DEFENDANT:  Right.

THE COURT:  All right.  Are you under the influence today of any alcohol or drugs that would impair your judgment?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Have any promises been made to you in exchange for this agreement, other than what General Long told me?

THE DEFENDANT:  No Your Honor.

THE COURT:  Are you entering into this agreement voluntarily?

THE DEFENDANT:  Yes, I am.

(Id. at 9.)

Penner contends that his plea was not voluntary and intelligent because he suffers from a mental illness and because he feared that, if he did not plead guilty, his wife would lose custody of the children.  The Tennessee Court of Criminal Appeals considered and rejected these arguments, and Penner has not identified any defects in the state court's reasoning.  He also does not explain how that decision is objectively unreasonable, rather than merely incorrect.[14]

---

[14]     Penner does not appear to contend that he was legally incompetent. In Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 788, 4 L. Ed. 2d 824 (1960) (per curiam), the Supreme Court held that the standard for competence to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him."  The competency standard for pleading guilty is identical to that for standing trial. Godinez v. Moran, 509 U.S. 389, 398-99, 113 S. Ct. 2680, 2686, 125 L. Ed. 2d 321 (1993).

The conclusion of the Tennessee Court of Criminal Appeals is supported by the evidence in the record. At the post-conviction hearing, trial counsel testified that he was aware that Penner was attending counseling sessions at a mental health facility named Centerstone. (Tr. of Post-Conviction Relief Hr'g at 6, <u>Penner v. State</u>, PCR No. 1009 (Perry Cnty. Cir. Ct.), D.E. 19-2.) Counsel believed the sessions were valuable because "[w]e needed to see if there was anything underlying; mental defect or aberration. I would need to know about it." (<u>Id.</u>) Counsel received reports through August, 2003 from Centerstone that diagnosed Penner as a pedophile and an exhibitionist. (<u>Id.</u> at 10.) He testified that "the only thing that they stated from a mental point that would have any legal bearing on my defense, they just said he had a generalized anxiety disorder. There was nothing to indicate that he couldn't appreciate right from wrong or he had any serious mental defect." (<u>Id.</u>) Trial counsel did not see any basis in fact for requesting a competency evaluation. (<u>Id.</u>) He stated that, "[b]ased upon my interviews and consultations with him, he seemed very lucid, very -- he understood what he was facing, he was able to respond to me in an intelligent manner. And then after I read these reports, I would not have any factual basis to question his competency." (<u>Id.</u> at 10-11.)[15]

---

[15] Trial counsel was questioned about a document, dated December 11, 2003, that appeared to conclude that Penner suffered from a severe and persistent mental illness. (Tr. of Post-Conviction Relief Hr'g at 12-14, <u>Penner v. State</u>,

(continued...)

Trial counsel knew little about Penner's church community. (Id. at 26-27.) He recalled that his client had stated, at one point, that "the Grand Jury had, I think, made the comment to have members of his church congregation charged because they were aware of his actions and had not taken any action to report it to the authorities." (Id. at 23.)

Counsel was questioned about the possibility that Penner's guilty plea was induced by threats:

> Q. Are you aware of anyone; whether it's a police officer, investigator from the D.A.'s office, or an agent of the Department of Children's Services, do you know of anyone who made any threats to Mr. Penner?
>
> A. No.
>
> Q. No one ever threatened the loss of [sic] removing his children from his wife if he didn't cooperate?
>
> A. I was not aware of that.
>
> Q. Did Mr. Penner ever raise those concerns?
>
> A. I wasn't aware of it from DCS's standpoint. But in making the decision that he made to plead to a lesser charge, he was understanding that by him doing this, his children would remain with their mother and they would not be displaced; they would be in their home and they would be with their mother. So this was another factor that motivated him to take a negotiated plea.

15 (...continued)
PCR No. 1009 (Perry Cnty. Cir. Ct.), D.E. 19-2.) Counsel had never seen the document before, and he noted that it was unsigned and did not contain the name "Centerstone" or any other provider or facility. (Id.) The document, which is found at D.E. 19-3 at 3-5, has never been authenticated. The "mental illness" appears to be pedophilia. (See D.E. 19-3 at 3.) According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), code 302.2 is pedophilia, and code 311 is Depressive Disorder Not Otherwise Specified ("NOS"). See http://allpsych.com/disorders/disorders_dsmIVcodes.html/.

Q. Did he ever indicate to you that anyone had told him that if he didn't do this, that they were going to take the children from their mother?

A. No.

(*Id.* at 27.)

Penner's co-counsel testified that, at the guilty plea hearing, the inmate did not tell him that he was under the influence of medication that would affect his ability to enter a plea. (*Id.* at 41.) He testified that "if any of those things had occurred, we would not have done the plea." (*Id.*)

Bill Saul, a member of Penner's church, testified that he attends an Anabaptist church called Church of God and Christ Mennonite. (*Id.* at 43.) Saul related that he heard Penner confess to abusing his daughter. (*Id.*) In response to whether the community was concerned about its potential liability, Saul stated that "I don't think it ever entered our minds." (*Id.*) Although his testimony was sometimes unclear, Saul appeared to believe that Penner was "thinking of his family, thinking of the community. He was willing to try to spare us." (*Id.* at 47.) The witness denied telling Penner that he needed to enter a plea for the benefit of the community. (*Id.* at 48.) He also denied advising Penner that he needed to confess for the benefit of the community. (*Id.*)

Barry Carroll, an investigator with the District Attorney's Office, claimed she never made any threats to Penner:

Q. Did you ever tell Mr. Penner that it would go easier on him if he just accepted it and did what was asked of him?

A. No.

Q. Did you ever tell him that you had met [sic] anyone more cooperative?

A. Yes.

Q. Did you ever tell him that if he didn't cooperate, that his wife would lose their children?

A. No.

(Id. at 56.)

Penner testified that he had been a member of the Mennonite community his entire life. (Id. at 62.) Members of his faith are taught "to cooperate with the law, you know, to pray for them, and not to evade or hinder the law in any way." (Id.) He related that members of his faith are required to follow the requests of the community or face excommunication, which meant "to be severed from membership in the organization." (Id. at 68.) Penner did not want his wife and daughters to be excommunicated. (Id. at 69.)

According to Petitioner, the investigation by DCS and the District Attorney was precipitated when he "tr[ied] to get mental health help, because my mental health was really low and deteriorating at the time." (Id. at 63.) His "mental health issues" were "depression and things -- anxiety and panic attacks." (Id.) He had regular appointments at Centerstone in Nashville. (Id. at 64.) Penner recalled that "they diagnosed me as like

48

manic-depressive and, you know, anxiety disorder, and that I would need, you know, continued treatment; that with treatment there would be a good prognosis for recovery." (<u>Id.</u> at 65.) He did not discuss his diagnosis with his attorney, although he recalls his attorney stating, "Your part is to make sure you go to all your appointments, and my part is to negotiate with the D.A." (<u>Id.</u>)

During the investigation and at the time he pled guilty, Penner was "taking antidepressants." (<u>Id.</u> at 64; *see also* <u>id.</u> at 72.) The inmate testified that he did not remember telling his attorney that, but neither "do I remember him inquiring. You know, he didn't seem to want to ask any questions to know much about me." (<u>Id.</u>) He said he had no idea that his use of antidepressants was something he should mention to his attorney. (<u>Id.</u>) He was also attending therapy sessions at Centerstone when he pled guilty. (<u>Id.</u> at 72.) Penner was asked why he testified and signed plea documents stating that he was not under the influence of drugs, and he responded:

> Well, the thing of it was it didn't mean anything to me what the waiver was. I didn't know the importance of the details, you that, that this was an important part of the process. The only thing I was trying to do was to take the plea, because I wasn't given any other choice.

(<u>Id.</u>)

Penner stated that he felt pressured to plead guilty:

> Q. Was there ever any discussion of what would happen to your wife depending upon what you do?
>
> A. Yes, yes. Yeah, they --

49

Q.   Can you tell the Court about those discussions?

A.   Yeah, there was -- from my understanding, it came through DCS that I would need to take the guilty plea before they -- otherwise they would prosecute my wife and they would put up the children for adoption; you know, basically what I -- in my words, "on the open market."

Q.   So you're saying someone from the Department told you that?

A.   Yes, that's what my wife -- was told my wife. And my wife conveyed this to me, and she was very, very concerned about it, because we were very scared about, you know, the children losing their mother as well.

Q.   So did you feel that you were threatened that your children would be adopted by someone?

A.   Yes, and that was a very, very real fear that was -- because we was trying desperately to keep our family together.

. . . .

Q.   Had anyone from DCS ever told you personally that you have to do X, Y or Z or we're going to take the children from your wife?

A.   I don't remember them directly saying it to me.

(Id. at 66-67; see also id. at 69-70 (Penner's wife wanted him to plead guilty because "she was under the strong impression that they were going to prosecute her like they was prosecuting me, and they would take the children from her too"), 78 (Penner relied on his wife's statements about what DCS told her), 82 ("As I would not question my wife, seeing her being extremely fearful that those threats weren't absolutely, totally valid.").)  Penner testified that he did not recall discussing those threats with his attorneys.

50

(Id. at 73.) He did remember that his attorney told him that, if he were convicted at trial, he could receive "something about [fifty] years I remember. I know he said in terms of it's more time that what you can do, or pretty much be the rest of your life." (Id. at 75.)

The conclusion of the Tennessee Court of Criminal Appeals that the prisoner's guilty plea was intelligent and voluntary is not an unreasonable application of Boykin. That conclusion is also not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Therefore, this issue is without merit and is DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the petition pursuant to 28 U.S.C. § 2254. The motion for an evidentiary hearing is DENIED as moot. The petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## V.        APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Cockrell, 537 U.S. at 335, 123 S. Ct. at 1039; Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005), reh'g en banc denied (Jan. 10, 2006). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may

not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Cockrell, 537 U.S. at 336, 123 S. Ct. at 1039 (internal quotation marks omitted); see also Henley v. Bell, 308 F. App'x 989, 990 (6th Cir.) (per curiam) (same), cert. denied, 555 U.S. 1160, 129 S. Ct. 1057, 173 L. Ed. 2d 482 (2009). A COA does not require a showing that the appeal will succeed. Cockrell, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. Bradley, 156 F. App'x at 773.

In this case, there can be no question that Petitioner's claims are meritless for the reasons previously stated. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a COA.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first

file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(4)-(5). In this case, for the same reasons it denies a COA, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[16]

IT IS SO ORDERED this 27th day of September 2012.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[16] If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).